**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | |
|---|---|
| PAULA MIRELES, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DANIEL DEFENSE, LLC, et al.,<br><br>Defendants. | Case No.: 2:24-cv-00072 |

**DEFENDANTS EOTECH, LLC'S AND PROJECT ECHO HOLDINGS, LLC'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants EOTECH, LLC ("EOTECH") and Project Echo Holdings, LLC d/b/a American Holoptics ("Project Echo"), by and through their attorneys, respectfully submit this notice of supplemental authority regarding the implications of the U.S. Supreme Court's decision in the case of *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. __, No. 23-1141, 2025 WL 1583281 (June 5, 2025) ("*S&W*"), to their pending motion to dismiss Plaintiffs' claims against them.

In the *S&W* case, Mexico sued several firearms manufacturers claiming that they "aided and abetted unlawful sales routing guns to Mexican drug cartels." 2025 WL 1583281 at *4. The Supreme Court unanimously held that the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-03 ("PLCAA"), is an immunity statute that Congress enacted for the "core purpose" of:

> halt[ing] a flurry of lawsuits attempting to make gun manufacturers pay for the downstream harms resulting from misuse of their products. In a "findings" and "purposes" section, Congress explained that PLCAA was meant to stop those suits—to prevent manufacturers (and sellers) from being held "liable for the harm caused by those who criminally or unlawfully misuse firearm[s]."

*Id.* at \*9 (internal citation omitted). The Court determined that because Mexico's claims at the pleading stage did not plausibly allege violations of a predicate statute, the "defendant manufacturers retain their PLCAA-granted immunity." *Id.*; *see also id.* at \*10 (describing the PLCAA as providing a "general grant of immunity") (Jackson, J., concurring).

The Supreme Court's decision in *S&W* recounted Mexico's specific allegations of crimes committed with firearms, and why Mexico contended the firearm manufacturers were legally responsible for those crimes based on their own alleged misconduct, as follows:

- Mexico has a severe gun violence problem, which its government views as coming from north of the border.

    - [G]un traffickers can purchase firearms in the United States—often in illegal transactions—and deliver them to drug cartels in Mexico.

    - Those groups, predictably enough, use the imported firearms to commit serious crimes—drug dealing, kidnapping, murder, and others.

- Mexico's primary line of argument is that the manufacturers supply firearms to retail dealers whom they know illegally sell to Mexican gun traffickers.

    - A small minority of the dealers are responsible for most of the sales to Mexican traffickers; and those sales often violate federal gun laws—by, for example, involving straw purchasers or proceeding without background checks.

    - The manufacturers know who those bad apple dealers are. \*\*\*\* Yet the manufacturers continue to supply those dealers, as they do legitimate ones, in order to boost their own profits.

- Mexico claims that the manufacturers have failed to impose the kind of controls on their distribution networks that would prevent illegal sales to traffickers.

    - [T]hey could prohibit dealers from making bulk sales to individual customers, because guns sold in that way (Mexico says) are likely to be diverted to the illegal market.

    - [T]hey could bar dealers from selling their firearms at gun shows or out of their homes, because those sales (Mexico again says) often ignore regulatory requirements like background checks.

- o [M]anufacturers could implement processes for monitoring or supervising their dealers' sales practices, so as to minimize illegal sales to traffickers.

- Mexico alleges that the manufacturers make design and marketing decisions intended to stimulate cartel members' demand for their products.

  - o [M]anufacturers have increased production of military-style assault weapons, with an eye toward cultivating the criminal market.

  - o [M]anufacturers make guns whose serial numbers can be obliterated or defaced, thus hindering police tracing efforts.

  - o [M]anufacturers produce firearms whose names or aesthetic features appeal to cartel members.

*S&W*, 2025 WL 1583281, at **4–5 (cleaned up).

The Supreme Court summarized Mexico's claims as asserting a:

variety of tort claims against the defendants, mostly sounding in negligence. The basic theory is that the defendants failed to exercise "reasonable care" to prevent trafficking of their guns into Mexico, and so are responsible for the harms arising there from the weapons' misuse.

*Id.* at *5. The Supreme Court summarily concluded "[t]hat theory, as all agree, runs straight into PLCAA's general prohibition" and, therefore, "Mexico's action, that is, seeks to hold firearms manufacturers liable for 'the criminal or unlawful misuse' of guns by third parties—and so, according to PLCAA, 'may not be brought.'" *Id.* (*citing* 15 U.S.C. §§ 7902(a), 7903(5)(A)).

Mexico's complaint had raised additional marketing-related allegations, including a claim against one defendant, Smith & Wesson, for violation of the Massachusetts Consumer Protection Act. *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 633 F. Supp. 3d 425, 435-37 (D. Mass. 2022). Those claims alleged that the "defendants 'routinely' market their guns with military and law-enforcement images and language" and "that the use of explicit military and law enforcement references, as well as references to a weapon's ability to function in 'combat-like

scenarios,' attracts dangerous users or criminals." *Id*. at 435–36 (internal citations omitted).[1] The complaint further alleged that the "defendants utilize these marketing tactics while knowing that they are 'disproportionately' attractive to criminal organizations." *Id.* at 436. Based on those allegations, Mexico claimed that defendants were liable because the manner in which they marketed and advertised their firearms contributed to their use by third-party criminals. *Id.* at 435–37.

The district court in the *S&W* case dismissed such claims at the pleading stage, as this Court should here, noting that the advertising and marketing of which Mexico complained was "perhaps distasteful, but it is not false, misleading, or deceptive" as required to impose liability under state consumer protection statutes. *Estados Unidos*, 633 F. Supp. 3d at 452–54 (noting that nothing about the advertisement is unlawful or immoral, unethical, oppressive or unscrupulous) (citation and quotation marks omitted). Recognizing that its attempt to impose liability for the marketing and advertising of firearms predicated on alleged violations of a state consumer protection statute had no basis in law, Mexico did not even appeal the dismissal of those claims. *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 518 n.3 (1st Cir. 2024). Had it done so, the Supreme Court would have undoubtedly dismissed them for the same reasons it dismissed all of Mexico's other claims.

---

[1] Mexico further alleged, among other things, that one defendant "highlights their gun's ability to 'eat more ammo,'" which allegedly "indicates the gun's capacity for rapid-pace, high-output shooting that, allegedly, would be neither necessary nor desired for the average civilian buyer," and another "uses military uniforms, associates with police, and discusses 'tactical' uses to advertise its guns." *Id. Estados Unidos*, 633 F. Supp. 3d at 436, n.4.

**The Supreme Court's Decision in *S&W* Requires the Dismissal of Plaintiffs' Claims Against EOTECH and Project Echo in This Case.**

In the present case, the Petition asserts claims against EOTECH and Project Echo for negligence, gross negligence, and aiding and abetting the wrongful conduct of others based on allegations that when he was seventeen years old, the Shooter purchased a holographic or red dot sight (the "Sight") from EOTECH's website. Pet. ¶¶ 9, 71. Plaintiffs seek to hold EOTECH and Project Echo liable based on the marketing of the Sight using phrases such as "donut of death," "battlefield proven," and the "choice of America's elite warriors," and because the Sight has been featured in video games. Pet. ¶¶ 71-79. The Petition does not allege that the Sight is an illegal product, that it is an age-restricted product, that EOTECH violated a state or federal statute applicable to the sale or marketing of firearms (or component parts of firearms) by selling the Sight to the Shooter, or that any other exception to the PLCAA applies to the claims against EOTECH and Project Echo. Instead, Plaintiffs argue that the Sight is not a component part of a firearm, and therefore not a qualified product for purposes of the immunity provided by the PLCAA. They also contend that because EOTECH and Project Echo make parts for firearms, instead of firearms, they are not manufacturers[2] for purposes of the PLCAA, despite them meeting the statutory definition of a manufacturer set forth in 15 U.S.C. § 7903(2).

As explained in the motion to dismiss, the Sight is a component part of a firearm, and therefore a qualified product as defined by the PLCAA, and by EOTECH and Project Echo are manufacturers for purposes of the immunity provide by the PLCAA. Those are the sole issues on which Plaintiffs dispute that their claims constitute a qualified civil liability action for purposes of

---

[2] Of note, the definition of a manufacturer under the PLCAA was not at issue in the Supreme Court's decision in the *S&W* case, as Plaintiffs have incorrectly claimed in their response to another defendant's notice of supplemental authority.

the PLCAA. Although the issue of what constitutes a component part of a firearm for purposes of the PLCAA was not at issue in the *S&W* case, the Supreme Court's decision counsels against attempts to avoid the immunity provided by the PLCAA by attempting to classify parts, such as the Sight, as accessories in order to avoid the immunity provided by the PLCAA. In its decision, the Supeme Court suggested that the predicate exception can only be satisfied by the alleged violation of statutes specifically applicable to the sale or marketing of firearms, like the provisions of the Gun Control Act cited as examples in the predicate exception itself. *S&W*, 2025 WL 1583281, at *9; *see also id.* at *3 ("gun-sale violation"); *3 ("federal gun crime"); *4 (sales that "violate federal gun laws"); *7 ("unlawful sales of firearms"); *8 ("firearms violation"). The Court warned that broadly reading the predicate exception to allow other types of claims to survive would "swallow most of the rule," and that it was doubtful that "Congress intended to draft such a capacious way out of the PLCAA." *Id.* at 9. For that reason, in a concurring opinion, Justice Thomas cautioned that courts should give "careful consideration" to the predicate exception's requirement that defendants have actually "violated" a statute applicable to the sale or marketing of firearms. *Id*. at *9 (Thomas, J., concurring); *see also id.* (explaining that it is improper to allow cases to proceed based on "mere allegations of a predicate violation").

Justice Jackson similarly explained that the PLCAA was enacted in "response to a flood of civil lawsuits that sought to hold the firearms industry responsible for downstream lawbreaking by third parties." *S&W*, 2025 WL 1583281, at *9 (Jackson, J., concurring). She noted that "[a]ctivists had deployed litigation in an effort to compel firearms manufacturers and associated entities to adopt safety measures and practices that exceeded what state or federal statutes required." *Id.* As Justice Jackson recognized, the PLCAA "reflects Congress's view that the democratic process, not litigation, should set the terms of gun control." *Id.* at *10. She realized that allowing lawsuits that

Congress had intended to prohibit to continue based on the mere presence of conclusory "allegations about particular statutory violations" would "turn the courts into common-law regulators" and violate the "basic design" of the PLCAA to "preserve the primacy of the political branches—both state and federal—in deciding which duties to impose on the firearms industry." *Id.*

Allowing Plaintiffs to subvert the immunity that Congress provided through the PLCAA simply by referring to the parts that comprise a firearm as "accessories," and arguing that manufacturers of such parts are not manufacturers for purposes of the PLCAA despite meeting the statutory definition set forth in 15 U.S.C. § 7903(2), would do exactly what Congress intended the PLCAA to prohibit. The Supreme Court warned against attempts by plaintiffs to plead around the immunity provided by the PLCAA to "use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees." 15 U.S.C. § 7901(a)(8). This Court should reject Plaintiffs' attempt to negate the immunity provided by the PLCAA in this case by referring to the Sight as an "accessory" instead of a component part for a firearm, and disregarding the statutory definition of a manufacturer.

Plaintiffs also argue that EOTECH and Project Echo aided and abetted the alleged wrongful conduct of defendant Daniel Defense, LLC ("Daniel Defense") by encouraging the use of its sights on rifles made by Daniel Defense. Pet. at 71-79, 98-99. These types of factual allegations do not remotely support the requirements for aiding and abetting liability pursuant to the PLCAA.

In *S&W*, the Supreme Court explained that:

Federal aiding-and-abetting law reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he deliberately helps another to complete its commission. To aid and abet a crime, a person must take an affirmative act in furtherance of that offense. And he must intend to facilitate the offense's commission." \*\*\*\*  An aider and abettor must

participate in a crime as in something that he wishes to bring about and seek by his action to make it succeed.

2025 WL 1583281, at *5 (cleaned up). The Court further noted three principles related to aiding and abetting liability:

- First, aiding and abetting is most commonly a rule of secondary liability for specific wrongful acts. It is possible for someone to aid and abet a broad category of misconduct, but then his participation must be correspondingly pervasive, systemic, and culpable.

- Second, aiding and abetting usually requires misfeasance rather than nonfeasance. Absent an independent duty to act, a person's failures, omissions, or inactions—even if in some sense blameworthy—will rarely support aiding-and-abetting liability.

- And third, routine and general activity that happens on occasion to assist in a crime—in essence, incidentally—is unlikely to count as aiding and abetting. So, for example, an ordinary merchant does not become liable for all criminal misuses of his goods, even if he knows that in some fraction of cases misuse will occur. The merchant becomes liable only if, beyond providing the good on the open market, he takes steps to promote the resulting crime and make it his own.

*Id.* (cleaned up).[3] Even if Plaintiffs had pled a valid claim that EOTECH and Project Echo had aided and abetted the actions of Daniel Defense, their claims would still have to be dismissed pursuant to the PLCAA. That is because Plaintiffs do not allege that they aided and abetted Daniel

---

[3] Like Plaintiffs' claims in this case, all of Mexico's causes of action were based on state law. *Estados Unidos*, 633 F. Supp. 3d at 431. Mexico did not seek to rely on the federal criminal aiding and abetting statute, 18 U.S.C. § 2(a), and it was not referenced in either the district court's or the circuit court's decisions. The Supreme Court applied federal aiding and abetting law because whether there can be aiding and abetting liability for purposes of the predicate exception to the PLCAA is an issue of federal law, even if all of the claims raised by a plaintiff arise under state law. Nonetheless, and as explained in the motion to dismiss, Texas law poses an additional problem for Plaintiffs—the Texas Supreme Court has never recognized aiding and abetting as a cause of action, *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017), and the Fifth Circuit Court of Appeals has held that such claim does not exist under Texas law, *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018).

Defense to violate a state or federal statute applicable to the sale or marketing of firearms, as would be required to satisfy the predicate exception to the PLCAA.

Dated: July 22, 2025

        Respectfully submitted,

By:   */s/ Scott C. Allan*
Christopher Renzulli (State Bar No. 2658433)
Scott C. Allan (State Bar No. 3910940)
**RENZULLI LAW FIRM, LLP**
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
Facsimile: (914) 285-1213
Email: crenzulli@renzullilaw.com
      sallan@renzullilaw.com

-and-

Daniel Buechler (State Bar No. 24047756)
**THOMPSON, COE, COUSINS & IRONS, L.L.P.**
Plaza of the Americas
700 North Pearl Street, Twenty-Fifth Floor
Dallas, TX 75201-2832
Telephone: (214) 871-8262
Facsimile: (214) 871-8209
E-Mail: dbuechler@thompsoncoe.com

-and-

Zandra Foley (State Bar No. 24032085)
**THOMPSON, COE, COUSINS & IRONS, L.L.P.**
4400 Post Oak Parkway, Suite 1000
Houston, TX 77027
Telephone: (713) 403-8200
Facsimile: (713) 403-8299
E-Mail: zfoley@thompsoncoe.com

Attorneys for Defendants EOTECH, LLC and Project Echo Holdings LLC d/b/a American Holoptics

-10-

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was electronically served upon all counsel of record through the CM/ECF system on this 22nd day of July 2025.

*/s/ Scott C. Allan*
Scott C. Allan